We'll hear the next case, Peterson Energia versus Argentine Republic. I've got my phone. We'll just use our phone. And I'll give them a warning. Sure, sure. Yeah, that's running. Yeah, it's on. Okay. Alright, we have technical issues. The clock is frozen. We're reluctant to reboot it because we might lose Judge Winter. So what we're going to do is just keep track of the time on my phone. I'll give you a warning. And you are going to argue for four minutes. And then you're saving two minutes for rebuttal. And then we're going to hear from Mr. Paskin for four minutes. I'll give you a warning. Okay. Go ahead. Thank you very much, Your Honor. I'm Dr. Laura Berry-Grinalds on behalf of the Republic of Argentina. This case involves an unprecedented circumvention of the fundamental principle of sovereign immunity that attaches to a state's exercise of its power of expropriation. In this case, the court applied the commercial activity exception by looking around the core cause of the injury at the effects of the expropriation. And that was directly contrary to this court's decision in Garb v. Poland, as well as the Supreme Court's recent decision in OBB v. Sachs, which instructs that the threshold question for the application of the commercial— expropriation, they are challenging what they believe is a breach of the contract. It doesn't matter how Argentina got the shares, but it was required to comply with the tender offer provisions. So what's your response to that? The response is that despite how they've drafted it, and the Supreme Court warns against an artful recharacterization of the pleading in order to fall within the commercial activity exception, as does this court in the Garb v. Poland case. What we are to look at is the core of the claim, the foundation of the claim. And let me—to quote the Supreme Court in OBB, this court is required to, quote, zero in on the core of the suit, the sovereign acts that actually injured the plaintiff. What is the core of the claim here? The core of the claim— They're saying the core of the claim is a repudiation of a contractual obligation, a commercial obligation. That can't be assessed outside of the formal act of expropriation, which they admit triggers their alleged breach and which is dealt with separately under this Court's and the Supreme Court's precedents from time immemorial. Originally— Are you saying that the expropriation and the negation of this contractual right are all one act? Exactly. They're the flip side. They can't be—the contractual breach can't be severed from the act of expropriation any more than in the Brock v. Bencomer case. The supposed breach of the CD obligations could be severed from the Mexican government's Exchange Act regulations, which were public acts. The issue here is what powers did the sovereign exercise in affecting the act that caused the injury? And they are public powers, quintessentially public powers. We know of no case involving an expropriation. Weren't the bylaws revised to protect against this very event that's happening here? That is Plaintiff's argument, as was Nelson's argument that a contract lured Nelson into Saudi Arabia. But the Court's inquiry is what were the sovereign acts? Did they involve public power or— Is it correct that the bylaws, or these particular bylaws, were passed to protect private investors against renationalization? That is Plaintiff's allegation. But again— But I'm asking you—I know that's the allegation. Do you agree with it? What is there in the record that tells us whether that's correct or not correct? Even accepting that to be true, Your Honor, it doesn't change your analysis because the Court's— What you are saying, I take it, is that a foreign sovereign, regardless of a question of active state, but a foreign sovereign can give any number of assurances to investors and then acting as a sovereign can renege them. Exactly. If— So don't argue with whether they were saying them. They said that to take in these investors. Your answer to that has to be yes, but so what? It is, and this is not a mere repudiation of a contract. This is a formal act of expropriation conducted pursuant to law for the public interest of Argentina. It's experts submitted opinions showing that that act, pursuant to the Constitution, takes primacy. This is Judge Winter in New Haven. Where in the expropriation act does it invalidate this bylaw? By definition, the expropriation act is— first, it takes primacy over any conflicting private laws. I asked you where it did anything to affect the bylaw, where it mentioned the bylaw. By issuing a legislative decree that is inconsistent with the application of the bylaw— What is inconsistent? It's inconsistent in several ways, Your Honor. It's inconsistent in only requiring acquisition of 51% rather than 100%, as would be required under the tender obligations. It's inconsistent, and this is important, in empowering the state to immediately exercise the— Excuse me. Excuse me. Did it invalidate— Did it somehow bar— Did the expropriation act somehow bar the Republic of Argentina from complying with the bylaw? It did. And the reason— Where? It specifically empowers and instructs the government to exercise all rights of those shares. Under the bylaws, that couldn't occur unless the government launched a tender offer. So by definition, the legislative action instructed the government to immediately vote those shares, oust the directors, which it did. It occupied the shares without doing a tender offer. Those are antithetical to the requirements of the bylaws. They cannot be harmonized. Excuse me. Did it say that it could not execute a tender offer? It said it had the immediate rights that, under the bylaws, couldn't be enjoyed unless there were a tender offer. So by definition, it's inconsistent. Explain that to me. Okay. Could you explain that to me? Yes. Because, as Judge Winter has said, there is no specific order in the expropriation which says, thou shalt not make a tender offer. So you have to explain to me why doing this expropriation of these shares must have meant that they could not have made a tender offer. Yes. So explain that to me. First, the expropriation order required the government to acquire only 51%, leaving the company a public company. By definition, if it did a tender offer, it would have to take 100% of the shares. It would have privatized. Does it include the word only? It says, under Argentine law, an expropriation order must identify the exact property to be acquired. That's according to Peterson's experts. And they identified 51%. And, Judge Winter, they also stated specifically in the act that the company was to remain public. That is antithetical to a tender offer where the government has to buy back all the shares. Let me try to see, because you're saying it mighty quickly. You are saying that under Argentine law, when it says 51%, it must mean that they could not take over the whole thing. But why is that inconsistent with making a tender offer as a private party for the rest of it? That is, they have to take over by expropriation 51%. But does that mean that they cannot, as a private party, make an offer for the other 49? It does, because there is no way they could have accepted, which they would be required to do, the remaining shares and have remained a public company. At that point, the state would own 100% of the shares, and that is specifically precluded by the expropriation law. So it is not the fact that they specifically mentioned 51%, but it is this statement that they would remain a public company in the expropriation that you say is inconsistent with making a tender offer. I want to find out the specific thing which you say is inconsistent. I would suggest both those, but certainly the requirement to remain a public company, which is on the face of the law, is directly inconsistent with a tender offer, whereby it would become a wholly owned state company. In addition, the law is— Double your time. Okay. Use your rebuttal if you want. No, I'll move on. Just one other point. There is no provision in the agreement that requires a back-end tender offer. In fact, once the government became the majority owner, and as the plaintiff says, became Repsol and stood in Repsol's shoes, which the plaintiff says in its opposition and has argued, then at that point— From your colleague. Thank you. Okay. It had no obligation—okay. Thank you. Good morning, Your Honors. Michael Paskin for YPF. I don't want to repeat the ground that was plowed a little bit by Argentina's counsel, so I want to focus on a few things that are specific to the allegations and the claim against YPF here. So— Could you first address her point about the Expropriation Act directing that YPF become a private company? Yes, a public company, Your Honor. Yes. So the Expropriation Act says, Your Honor, that YPF will remain a public company. It directs that YPF is going to expropriate 51 percent of the shares. Also, the intervention orders, you know, the timeline here, there is a two-year period between—under the laws, between when YPF—well, excuse me, when Argentina announces the expropriation and passes the temporary decrees and the laws, and when it actually becomes a shareholder. So during the entire time period that the plaintiffs are complaining about here, Your Honor, YPF is not actually acting—is not the majority shareholder. They are using their temporary government powers through expropriation to act as if they were sitting in the shoes of Repsol, as if they were the shareholder. And I think the key test, which is both in the Weltover case, the Supreme Court case of Weltover, also in the D.C. Circuit, the Wrong case, which I think is squarely on point, the question is, in examining the gravamen of the claim and whether or not it implicates the commercial activity exception, is did the actions that are alleged here, are the actions at issue things that a private actor could have done in a private actor's commercial conduct? So had Carl Icahn or someone else come in and decided that they wanted to take control of YPF, could they have done what Argentina did? Could they have gone about it the same way? And the answer here is absolutely not. Had Carl Icahn come in and said, I'm going to take control of this company, he wouldn't have been able to do anything. He wouldn't have been able to vote a share, exercise any role at all until 2014, two years later, when they finally closed the transaction. So I think that's a very important distinction here because it goes to the question of, you know, is this commercial activity, is it activity that an ordinary private commercial party could have engaged in, or is it activity that only the government could have engaged in in its sovereign capacity? You're saying that there is a two-year period in which, which is crucial to this making a tender offer or not, which a private party could not have been involved in. Is that your point? That's correct, Your Honor. That's correct, Your Honor. And therefore, you're saying, this failure to make a tender offer must be part and parcel of the original expropriation. Exactly. Exactly, Your Honor. But why couldn't that have been something, the tender offer then had been made two years later by a private party? Why isn't it, why is the time both suggestive, why do you say it is determinative? Well, I think one point, Your Honor, is that Peterson has admitted in a separate proceeding, pursuant to the bilateral treaty between Argentina and Spain, that the conduct all relates to the expropriation, that they were harmed by the acts of expropriation. That's their admission in another proceeding, that in this proceeding they try to walk away from. And all of the— That's not the issue. Because they, of course, they were harmed by the expropriation in one way. But I want to know why this two-year period is crucial with respect to the tender offer or not. Well, I think the two-year period is crucial, Your Honor, because at some point, if they were purely engaged in commercial activity, and at some point they decided to take control, whether it was by buying shares in the open market, whether it was by agreeing with Repsol that they were going to acquire their shares privately and then become a shareholder that way, there is, you know, I believe the correct reading of both of the bylaws is there is a prior obligation to tender. And all of the notice obligations and everything that trigger from the tender, with the tender, go to this attempt through commercial activity to take control of the company. But here the control of the company was already accomplished. It was accomplished in the spring, I guess in their fall, of 2012. And it involved throwing out management, throwing out the board, occupying the company in a way that's really no different than if they had occupied it by surrounding the buildings with tanks. The government took control of the company. And through those powers, their so-called takeover, sort of like the case was in the wrong case in the D.C. Circuit, the takeover of the company was accomplished in a manner that could only have been done by the sovereign. And that is a critical distinction. You would concede that the case would be a lot easier if Argentina, at the time it took over, also said, and as part of the takeover, we abolish any duties in the bylaws to make a tender offer. That is, if they had said that rather than trying to tell us that this is all kind of implicit and a necessary part. Yes, well, of course, Your Honor. If they had said that, then I imagine this would only be proceeding in Spain or in Buenos Aires. Why didn't they? Well. I mean, you know, if you're taking over something and you're expropriating, you might as well say what you're doing. Well, they're expropriating, but they're also attempting to continue to run the company as a public company. And I think the other thing that's important that shows the conflict between plaintiff's interpretation of the bylaws and the act of assuming control by expropriation rather than by commercial activity is in Section 7D. I believe it's the second full paragraph of 7D of the bylaws that says, if you are already a controlling shareholder, then you have no obligation to tender. So if, for example, Repsol, who owned a majority stake in the company, wanted to acquire more shares, they had no obligation at the time to tender for the other shares because they were already a controlling party. So the expropriation, according to plaintiffs, puts Argentina in the place of control. This is a different argument that the bylaws don't apply at all here, but that's an argument. Isn't that an argument that goes to whether the contract was violated or not, rather than a foreign sovereign immunity argument? I mean, doesn't this argument constitute a contractual defense which says the taking over of a majority was expropriation, but then they are in the same position as the prior holders, and under the contractual obligation, that doesn't require a tender offer? That sounds to me like an ordinary and probably perhaps valid contractual defense. Frankly, Your Honor, I believe it involves both. Of course it could be a contractual defense if we were ever at that stage, but it is also a sovereign immunity issue because I think that we can't accept as a matter of pleading or crafting of their complaint or their arguments the plaintiff's notion that we're not challenging expropriation. All we're challenging are these contractual duties. You're also well over time. Thank you. Thank you, Your Honor. We'll hear from the other side. Sorry. I know. We don't have the clock, but it's okay. Oh, no, no. It's all right. Thank you, Judge Chin. And may it please the Court, I'd like to direct myself to Judge Calabresi's question. There was no expropriation here, deliberately, of course, because under Argentine law, if they had expropriated either our 49% shares or our bylaw right to a tender offer, they would have had to pay for it. And they did not want to do that, so they took only 51% of the Repsol shares, and then they affirmed in the expropriation law that all the bylaw rights were to remain in place. Now, what this Court held in Weltover, which was affirmed unanimously by the Supreme Court, and I'm quoting here from the opinion, where a sovereign enters the marketplace as a commercial actor, a subsequent breach of the commercial contract retains that commercial nature. Now, there's no dispute that Argentina and YPF entered the marketplace as commercial actors when they conducted an IPO in the United States and made contractual commitments in the bylaws. They specifically included Section 28 in the bylaws because nobody would buy shares from Argentina without assurances. That is fine. I want to come back to your first point. You are saying that under Argentine expropriation law, the amount they had to pay when they expropriated was based on the taking over of 51% of the shares, and if as part of the expropriation they would also have had to— they also took over and abolished this right to make tender, they would have had to pay more than what they were charged with. That's a thrust of your argument? That's correct. Now, where in the determination of what they had to pay for expropriating, is there any decision as to the value of what they expropriated? I mean, this is based on, you know, if we had a nice easy thing of saying you take over X amount of land and you pay this much because that's its value, and therefore you're not taking over the neighboring land, that's very easy to see. But what I want to know, that's a very interesting argument. I want to see whether it fleshes out in what they actually were ordered to pay. Well, it does flesh out because under Argentine law, they specifically have to designate what it is that they're taking, and here they only designated the 51% of Repsol shares. They said YPF would remain as a public company subject to the bylaws. They said even that the administrator who took over YPF on April 16 and took control of the company and therefore triggered our tender offer rights, they said even he was bound by the bylaws. Has there been any hearing or anything in which compensation for expropriation has been determined in Argentina? Well, yes, they have settled with Repsol, and they paid them for the 51% of shares that they took. But that was a settlement. So we don't have an Argentine court saying you are paying for 51% because that's what you took. But you see, Judge Calabresi, the bylaws itself specify the value of our tender offer rights. They specifically say in Section 28, if by any means direct or indirect, Argentina takes over the company. I don't know that Argentina law causes you to pay for them. I know perfectly well that the expropriation laws of different countries are very different from American one. When Italy took over my great uncle's villa to build an airport, they didn't pay market value. Much poorer because of that. That happens to be the law of Italy. It would not be the law of the United States. So I want to know when you tell me that that is because, you know, if we could see that, that would be a tremendously powerful argument in your favor. But you haven't given me any Argentina indication that that's what's going on. Judge Calabresi, we are not bringing an expropriation claim. We are bringing a breach of contract claim. A breach of our bylaw guarantees that in the event of a takeover, we are entitled to a tender offer at a formulaic price set forth in the bylaws. Counsel, I understand that, but you made an argument that this was obvious because of what happened in expropriation. And so I'm asking you to show me the expropriation that does that. You haven't. You may still have a perfectly good argument apart from that, but that makes the argument you first made not one which is quite as appealing as it sounded on its face. I will point the court to section 7 of the law of expropriation that specifies the property. It says the 51 percent shares held by Repsol, and then it goes on and says that they will be compensated pursuant to Argentine law. There's no mention of our bylaw rights being taken there. Your Honor, you mentioned that most of what they were arguing were contract claims that had nothing to do with the FSIA argument, that they were merits-based arguments. And that's absolutely correct. Under Weltover, there is no further inquiry. Weltover involved a presidential decree to breach the contract, and the court held that we were nonetheless entitled to bring our FSIA claim for damages for that breach of contract. It cannot be the case that having gone into the marketplace and made this solemn promise that they would respect our bylaw rights if they ever took over the company by any means, that they can say, well, we did it through expropriation and we didn't really specify that expropriation would apply even though we said by any means, and therefore your tender offer rights have just disappeared. They've simply disappeared. A different question, and that is, if we were to view this as an act of state rather than foreign sovereign immunities, and there is a question as to whether commercial exception applies, Justice Stevens' concurring opinion raises doubt about that. What is your argument against an act of state? Thank you, Your Honor. First of all, of course, it's an affirmative defense, which the court doesn't need to reach. But if you do reach it, it's— We don't need to reach it. The district court did certify, and it may be intertwined. Exactly. It's easily disposed of for two reasons. First of all, under this court's decision in Allied Bank, there is an effect of the law in the United States. Performance of the tender offer requirement was to take place in the United States. The shares were held in the United States. Under those circumstances, the act of state doctrine, as this court has held, does not apply. Second, as Judge Chin pointed out at the beginning, we are not challenging the expropriation. We are not challenging the executive decree that suddenly took over the company. Those are the premises of our argument, which is for a breach of contract that was triggered by those actions. So we are not asking the court in any way to invalidate or undo the takeover of the Repsol shares. That's a given. That's done. But that does not preclude our right to seek damages for the breach of our contractual rights. It simply cannot be that they say, well, because we rushed in on April 16th and didn't have time to do a tender offer before, our tender offer obligation simply disappears. We don't have to do that. Their rights worth billions of dollars have simply gone up in smoke. Well, Weltover precludes that sort of argument. Their only arguments are about the purpose. Excuse me. Do I understand you to say that if we were to view this as an act of state, the act of state here was only the taking over of the 51 percent? There was no act of state with respect to the contractual rights, so that it isn't a question of commercial exception or not. It's what the act of state was. Correct. Okay. That is our argument. And then the subsequent breach of contract action we are allowed to pursue. And YPF, of course, has no immunity under the FSIA. They are a commercial enterprise. They may be owned now 51 percent of Argentina, but they have no sovereign powers. Everything they do is commercial. You have two minutes. If I have time. You have two minutes. Okay. The one other point I'd like to make, and this follows up with Judge Calabresi's point that everything they're arguing is really irrelevant under the FSIA. They want to argue about purported conflicts between the bylaws and the expropriation law and decree. That boils down to providing reasons why they breached the contract. Those reasons are wrong for reasons we can explain or develop below. But as the Supreme Court and this Court held in Weltover, and I quote, it's irrelevant why Argentina acted as it did. It matters that it only breached a commercial obligation. And that's directly built into the statute under 1603D. It focuses on the nature of the acts. And here, under Clause 3 of the Commercial Activities Exception, all that matters, and Judge Preska walked through this very clearly, is that it was based on an act outside of the United States. They don't dispute that. It was taken in connection with commercial acts. They cannot dispute that because the whole course of issuing the bylaws and conducting the IPO was a commercial act, and it caused a direct effect in the United States. End of story. Unless the Court has further questions. Thank you. Thank you. We'll hear rebuttal. Your Honor, first of all, this case is not like Weltover because this involves a formal act of expropriation, which this Court has dealt with very distinctly, most recently in the Garb case, and dealing with related transactions held that subsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation. That's exactly what we have here. The same argument plaintiffs make in an attempt to focus on the commercial relationship was made in the wrong, the Leonong Province case by the D.C. Circuit. They followed this Court in Garb and reaffirmed that incidental or subsequent acts relating to an expropriation do not render that fundamental expropriation commercial activity, whereas here they all, quote, flow from the expropriation. This involved the exercise of sovereign powers unique to a sovereign, unlike in Weltover where any party could issue debt, only a sovereign can expropriate property, which is why in every single case it has been dealt differently. Secondly, we've spent a lot of time discussing the effect of the expropriation under Argentine law. That proves two points. The plaintiffs are challenging the expropriation, and two, that this Court should have deferred to Argentina's experts on the effect under the law. There was no, just as in the application of our supremacy clause, it reigns supreme without identifying every action that every state law it preempts. Similarly here, the experts made clear that an act of expropriation under the Constitution was an act of public law which trumped private contracts, and that included anything that was inconsistent. The experts say that the obligation to tender and the prohibition of the vote was inconsistent. Let me ask you one question. If we were to rule against you, could Argentina then come and simply expropriate the contractual rights? Again, that would not- Would it do it? Yes, they possibly- I know you said they have done it. What I'm asking you is if we were to rule against you because we don't find that what you say is a necessary part of it, could they come back and say, okay, we now take it now? Could they do it? Assuming they haven't, they certainly could because the right of expropriation is inalienable. If I can just conclude on the act of state, Your Honor. You're out of time. Thank you. We'll hear from your colleague. Thank you, Your Honor. Just a couple of quick points. So Mr. Kellogg said that there was no immunity for YPF. That's wrong. Paragraph 8 of their complaint says YPF is currently an instrumentality of Argentina which owns a majority in controlling interest. Section 1603b-2 defines agent or instrumentality for purposes of the FSIA as an entity a majority of whose shares or other ownership interest is owned by a foreign state. There's no dispute about that. With respect to act of state, I think not the Allied case, but it is the case that Judge Winter was on the panel for in BRCA 30 years ago that's really the instructive one here. Because in Allied, the U.S. government stepped in with an amicus brief and specifically said there's no comedy concern. So the question of whether the U.S. courts should be passing on actions of a foreign sovereign and whether that implicated comedy issues was resolved there. In BRCA, it was very different. In BRCA, and particularly from YPF's perspective, there was a bank, a Mexican bank, that could not perform its obligations because the Mexican government passed certain laws that compelled the bank to act in a certain way. That's exactly what happened here. Here, specifically when you look at the conduct regarding YPF, what they're complaining about is that YPF sat by and allowed this to happen. What they principally allowed to happen was they allowed Argentina to vote the shares even though Argentina was not yet a majority shareholder. And the law itself, Section 9 of the law, which is at page A167 of the appendix, Section 9 of the law specifically says that the government is going to be able to exercise the political rights of the share ownership. And so to say that YPF was somehow obligated to prevent them from doing that is in direct conflict with the foreign law. This is a classic active state case, and particularly from the perspective of YPF, there's no conceivable reason why the plaintiffs should be able to get around that. But isn't the question, doesn't, if I may, the question remain of what the active state was, whether the active state was simply the taking over for 51 percent or whether the active state was also saying thou shalt not make a tender offer. Well, that may be a closer question examining the claim against Argentina. Examining the claim against YPF, Your Honor, what they say YPF did was they failed to stop this from happening. And with respect to voting and exercising the rights, the political rights of being a shareholder, which means voting, the law itself binds YPF. There's no way that YPF could have acted the way they say YPF should have acted without violating their own national law, which is exactly what the BRCA decision prohibits. Thank you. Thank you, Your Honor. Well-reserved decision. Just wait a moment until the crowd clears. Thank you. This is fine. I should give them a warning. I remember to give them a warning. Thank you.